# IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

## CENTRAL DIVISION

| | |
|---|---|
| ALLEGIS INVESTMENT SERVICES, LLC, ALLEGIS INVESTMENT ADVISORS, LLC, | **MEMORANDUM  DECISION AND ORDER** |
| Plaintiffs, | Case No. 2:17CV515DAK |
| vs. | Judge Dale A. Kimball |
| ARTHUR J. GALLAGHER & CO; INDIAN HARBOR INSURANCE COMPANY; and PAIGE NABAVIAN, | |
| Defendants. | |

This matter is before the court on several motions:  Plaintiffs Allegis Investment Services, LLC, and Allegis Investment Advisors, LLC's Motion for Summary Judgment [Docket No. 122]; Defendant Indian Harbor Insurance Company's Motion for Summary Judgment [Docket No. 125]; Defendants Arthur J. Gallagher & Co. and Paige Nabavian's Motion for Summary Judgment [Docket No. 126]; and Plaintiffs' Expedited Motion to Add a Claim for Reformation Under Plaintiffs' Declaratory Judgment Action or, Alternatively, to Amend Pleading to Conform to Proof [Docket No. 215].[1]  On December 13, 2018, the court held a hearing on the motions.  At the hearing, Plaintiffs were represented by Mary Anne Q. Wood and Jared M. Asbury, Defendant Indian Harbor was represented by Thomas J. Judge, Charles W. Chotvacs, and Defendants

---

[1]  The parties had not fully briefed Allegis' December 11th expedited motion for reformation prior to the court's December 13th hearing on the other motions.  The parties fully briefed the motion after the hearing, and the court issues a ruling on that motion based on the completed briefing.

Arthur J. Gallagher & Co. and Paige Nabavian were represented by Kristine M. Larsen, Mark W. Pugsley, and Aaron Hinton. The court heard argument and took the motions under advisement. After carefully considering the parties' memoranda and the law and facts relevant to the pending motions, the court issues the following Memorandum Decision and Order.

## BACKGROUND

Allegis Investment Services, LLC, ("AIS") is a broker-dealer investment company and Allegis Investment Advisors, LLC ("AIA"), is a registered investment advisor company (collectively, "Allegis"). In this case, Allegis seeks insurance coverage for claims against AIS and AIA relating to a "Net Credit Spread" investment strategy that Allegis employed in 2015. On August 20, 2015, Allegis, with full discretionary authority for its clients, executed a "put credit spread" based on the Russell 2000 index on a total of 39,200 put options on each side of the spread. This trade had a maximum potential profit of $313,600, and a maximum potential loss of $38,886,400. Allegis' investor accounts suffered the maximum potential losses from the August 20, 2015 trade, and many of the investors initiated arbitrations against Allegis to recover their losses.

On February 28, 2014, AIS was approved by the Financial Industry Regulatory Authority ("FINRA") as a broker-dealer. As part of the approval process, AIS was required to have broker-dealer investment advisors errors and omissions insurance coverage. Allegis tasked Brian C. Pierce, an accountant for AIS, with securing E&O coverage for AIS and AIA in 2014 and 2015. Pierce contacted Gallagher & Company and was put in contact with Paige Nabavian, a Gallagher representative. Nabavian assembled the application and forwarded it to John Churney, a wholesaler who worked for CRC Crump. Gallagher then proposed a policy to Allegis through Indian Harbor Insurance Company.

On February 28, 2014, Nabavian sent Pierce an email with two attachments: a Proposal for Insurance and an Indian Harbor "E&O" policy form and endorsements. The Proposal of Insurance contained information pertaining to the Broker-Dealers and Investment Advisors Errors & Omissions Policy Form through Indian Harbor Insurance Company for the policy period of March 3, 2014 to March 3, 2015, with limits of liability of $1,000,000 each claim/$2,000,000 aggregate for all losses. Allegis accepted the terms and conditions of the 2014 Proposal of Insurance and signed the Client Authorization to Bind coverage with Indian Harbor. The Client Authorization states that Allegis "understood this proposal provides only a summary of the details; the policies contain the actual coverages."

The Proposal of Insurance Disclosures section also informed Allegis that "the insurance policies themselves must be read" for details regarding all the terms, coverage, exclusions, limitations, and/or conditions of the actual policy contract language. The disclosures further stated that Gallagher & Co "will not be operating in a fiduciary capacity, but only as your broker/agent, obtaining a variety of coverage terms and conditions to protect the risks of your enterprise. We will seek to bind those coverages based upon your authorization; however, we can make no warranties in respect to policy limits or coverage considerations of the carrier. Actual coverage is determined by policy language so read all policies carefully."

The Proposal of Insurance also stated that "Gallagher strives to find appropriate coverage at a competitive price for our customers. In order to achieve these goals, we gather and analyze data about our customers and their insurance coverage. This data and the resulting analytical tools help us better understand the current marketplace, more accurately predict future trends and offer tailored solutions to our customers."

Allegis admits that it received a copy of the 2014 E&O Policy. The Policy contains the

following exclusion: "This insurance does not apply to any Claim or Defense Expenses: . . . Arising out of the actual or alleged purchase, sale, attempted sale, solicitation or servicing of any of the following: . . . . Commodities, any type of futures contracts, any type of option contract or derivative. However, this exclusion shall not apply to fully covered put or call options."

On February 21, 2015, Gallagher provided Allegis a Proposal of Insurance for the renewal of Allegis' E&O Policy through Indian Harbor for the policy period of March 3, 2015 to March 3, 2016, with limits of $1,000,0000 each claim/$2,000,000 aggregate for all loses. Allegis accepted the terms of the 2015 Proposal and signed the Client Authorization to Bind. The authorization and proposal contained the same provisions as the 2014 versions. Allegis received a copy of the 2015 E&O Policy. The 2015 E&O Policy contains the same terms and exclusions.

Pierce cannot recall whether anyone at Allegis read the 2014 or 2015 E&O policies. However, after the August 2015 losses occurred, Pierce and Heath Bowen, Allegis' Chief Executive Officer, read the language of the 2015 E&O Policy and concluded that any claims arising from the August 2015 losses would be covered because Allegis' strategy allegedly involved fully covered puts. Bowen testified that the Net Credit Spread strategy involves the trading of fully covered put options.

While Allegis claims that it disclosed its options trading in documents attached to its application for insurance, it cannot identify any document that explains the nature of Allegis' Net Credit Spread strategy. Pierce completed a 2014 Chubb Application and Supplemental Questionnaire for the E&O Policy, but he did not include information regarding Allegis' trading strategy. On the XL Application, Allegis stated that 25% of its recommended investments involved options but did not state the type of options contracts it traded or the nature of its strategy. Pierce, who was in charge of obtaining the insurance, had no personal knowledge

regarding the type of options trading that Allegis transacted or any understanding of the nature of the Net Credit Spread strategy. Gallagher did not have any independent understanding of the nature of Allegis' Net Credit Spread strategy.

Allegis never requested that Gallagher analyze the adequacy of the coverage or advise Allegis as to whether $1 million per claim/$2 million aggregate for all losses was an adequate amount of coverage for Allegis' business risks and potential exposure. Pierce cannot recall any specific discussion with Nabavian concerning the adequacy of Allegis' requested liability limits. However, he recalls discussing the fact that carriers were only willing to write certain limits due to the fact that Allegis was a relatively small start-up company. In addition, Pierce did not ask Gallagher to advise it as to whether claims specifically arising out of Allegis' Net Credit Spread strategy would be covered under the 2015 E&O Policy.

Bowen considered the August 2015 losses to be an unexpected event. Prior to the August 2015 losses, Allegis had never incurred losses arising out of the Net Credit Spread strategy even though Bowen had been using the strategy since 2009.

AIA conducted options trading for its clients via TD Ameritrade's platform for the Cboe. AIA advisors executed a TD Ameritrade Account Agreement for Options Trading. Pursuant to that agreement, the AIA advisor agreed that the advisor had implemented policies and procedures to obtain and retain client option information as well as to follow the position and exercise limits "set forth by FINRA Rule 2360." FINRA Rule 2360 addresses "options" and defines the term "covered" in connection with put options. "The term 'covered' in respect of a short position in a put option contract means that the writer holds in the same account as the short position, on a unit-for-unit basis, a long position in an option contract of the same class of options having an exercise price equal to or greater than the exercise price of the option contract in such short

position."  Rule 2360's definition of a "covered" put is consistent with, and essentially identical to, the definition provided by Rule 1.1(y) of the Cboe which is the exchange where AIA traded options.

AIA provided its investors with a disclosure for "uncovered puts" which stated that AIA would "honor all exercise assignments . . . on any uncovered put positions by purchasing the underlying security or settling the contract in cash."  AIA also provided the required FINRA Rule 2360 "Special Statement for Uncovered Option Writers."  The special statement disclosed that the "risk of writing uncovered put options is substantial.  The writer of an uncovered put option bears the risk of loss if the value of the underlying instrument declines below the exercise price." This was exactly the risk AIA's investors faced in the bull put/net credit spread strategy.

On August 20, 2015, AIA placed a block trade for all of its options investors employing a bull put/net credit spread, with the cost and losses distributed pro rata among the investors.  AIA directed the sale of 39,200 RUT put option contracts with an August 21, 2015 expiration and a strike price of $1,155.00.  AIA received a premium from each contract of $0.5272.  Allegis also directed the purchase of 39,200 RUT put option contracts with an August 21, 2015 expiration and a strike price of $1,145.00.  The cost of each contract was $0.4472.  Because each option contract involved a multiplier of 100, Allegis investors collectively received $2,066,624 for the puts sold, and paid $1,753,024 for the puts purchased, thereby creating a net credit in premium of $313,600 (minus transactional costs).

Indian Harbor alleges that the trade was not "covered" as that term is defined by FINRA Rule 2360 and Cboe Rule 1.1(y) because instead of buying puts at the same or higher strike price than the puts AIA sold, AIA bought puts at a lower strike price, which was solely a play for premium.  AIA bet that the RUT price near the end of August 2015 would largely stay the same

or increase. If the RUT had expired above the strike price of $1,155, AIA's option contracts would have expired "out of the money," and its investors would have retained the premium difference between the sold and bought puts–$313,600.

However, the trade settled down "in the money" at $1,145.06, which was well below the strike price for the puts sold by AIA and just a little higher than the strike price for the puts AIA purchased. AIA was required to buy 3,920,000 shares (39,200 options contracts with a multiplier of 100) of the RUT Index at $1,155 for a total of $4,527,600,000. AIA had to simultaneously sell the 3,920,000 shares of the RUT Index at the market price of $1,145.06 for a total of $4,488,635,200, paying the more than $38 million difference from the assets in client accounts. Factoring in the $313,600 in premium realized on the spread, AIA investors permanently lost a combined total of $38,651,200 on the August 20, 2015 trade. That loss amounted to roughly half of what AIA investors had in their accounts. In sum, AIA risked a total of $39.2 million for a maximum potential gain of $313,600. Following those losses, Allegis permanently discontinued its bull put/net credit spread strategy.

With all of Allegis' options investors losing half of their accounts on one trade, between September and mid-November 2015, AIA investors began to complain and threaten lawsuits and arbitrations. For example, one investor lost $50,000 for a potential gain of only $381. Allegis reported those matters to Indian Harbor. In addition to Allegis' investors asserting claims, state and federal regulators opened investigations. Allegis retained coverage counsel in August 2015 before it provided notice of investor claims to Indian Harbor.

Allegis reported eight matters to Indian Harbor arising out of the August 2015 options trade from disgruntled investors. On September 2, 2015, Indian Harbor sent letters acknowledging receipt of notice. Indian Harbor's letters also advised Allegis that it would

provide Allegis with an initial analysis of the Policy as it applies to the complaints received and, until it completed its initial review, it reserved all rights and defenses under the Policy and applicable law.

In mid-September 2015, Indian Harbor suggested three qualified law firms for Allegis to review and evaluate as potential defense counsel. Allegis wanted to use Quinn Emmanuel but Indian Harbor would not consider an international law firm with hourly rates exceeding $400 per hour for a $2 million policy. On September 22, 2015, Allegis chose Gordon & Rees to serve as defense counsel. On September 23, 2015, Indian Harbor sent confirmation to Allegis of Gordon & Rees' retention and stated that XL would issue a coverage position in the near term and, in the meantime, reserved all rights under the Policy and applicable law.

Following assessment of the submitted claim materials, Indian Harbor determined that the Policy did not provide coverage for the options investors' claims. On December 7, 2015, Indian Harbor issued a letter declining coverage for the eight noticed claims. Indian Harbor determined that the claims arose out of the trading of options which were not fully covered put or call options and, therefore, the Options Trading Exclusion barred coverage for the claims. Indian Harbor also determined that the matters arose out of the same options trade and strategy and were thus a single claim.

Indian Harbor's email to Allegis forwarding the letter, as well as the letter itself, asked Allegis to contact Indian Harbor with any questions or if it wished to discuss the matter. Indian Harbor's letter also advised that it "will gladly review any additional information or evidence you believe will aid us in reaching a different conclusion." Indian Harbor's claim counsel called Heath Bowen in conjunction with sending the December 7 letter and invited a telephone conference in the event that Allegis had any questions or disagreed with Indian Harbor's analysis.

Until this action was filed on June 5, 2017, no one associated with Allegis ever disputed Indian Harbor's coverage determination or provided Indian Harbor with any additional information for it to consider.

Based on Indian Harbor's denial of coverage, it did not pay any of the defense expenses incurred by Allegis. Through December 7, 2015, Gordon & Rees had incurred $31,332.00 in fees and expenses, which fall under the Policy's $35,000.00 deductible.

At the time Indian Harbor denied coverage, only one arbitration statement of claim had been served, which Allegis reported to Indian Harbor in November 2015. In addition to the eight matters reported to Indian Harbor between September and mid-November 2015, Allegis also seeks coverage for twelve additional matters arising out of the August 2015 trade that Allegis noticed to Indian Harbor during the policy period.

Following expiration of the 2015 E&O Policy, Allegis sought coverage through Pioneer Underwriters. In connection with its 2017 policy application, Allegis disclosed that 21 professional liability complaints had been made against it, and it listed 18 of the matters for which it seeks coverage for in this action.

## DISCUSSION

Allegis' Motion for Summary Judgment deals only with its insurance coverage claims against Indian Harbor, not any of its claims against Gallagher & Co. and Paige Nabavian. Therefore, it is actually a motion for partial summary judgment. Indian Harbor's motion for summary judgment seeks dismissal of all the claims Allegis has asserted against it. Gallagher and Nabavian's motion for summary judgment also seeks dismissal of all of Allegis' claims against them. Because Allegis' and Indian Harbor's motions are essentially cross motions on the same claims, the court will address them together. The court will then address Gallagher and

Nabavian's motion.

<u>**Allegis' & Indian Harbor's Cross Motions for Summary Judgment**</u>

Allegis seeks insurance coverage from Indian Harbor under the E&O Policy in relation to its investors' arbitrations against it, claiming that Indian Harbor had a duty to defend and indemnify it for the investors' actions under the terms of the Policy. Indian Harbor contends that the Options Exclusion in the E&O Policy barred coverage for the investors' actions against Allegis because Allegis' August 2015 trade did not involve fully covered put options. Allegis, however, argues that the Options Exclusion's carve-back for fully covered put options applies and it allows for coverage of the investors' claims against Allegis.

In interpreting the Policy, this court looks to Utah law. *Berry & Murphy, P.C. v. Carolina Cas. Ins. Co.*, 586 F.3d 803, 808 (10th Cir. 2009). Under Utah law, "[a]n insurance policy is merely a contract between the insured and the insurer and is construed pursuant to the same rules applied to ordinary contracts." *Alf v. State Farm Fire & Cas. Co.*, 850 P.2d 1272, 1274 (Utah 1993). "Like other contracts, an insurance policy is interpreted to give effect to the intent of the parties as expressed by the plain language of the instrument itself." *Headwaters Res., Inc. v. Ill. Union Ins. Co.*, 770 F.3d 885, 891 (10th Cir. 2014).

If the policy language is clear and unambiguous, the court must construe it according to its plain and ordinary meaning." *Alf*, 850 P.2d at 1274. An insurance policy is ambiguous "if it is unclear, omits terms, or is capable of two or more plausible meanings." *S.W. Energy Corp. v. Cont'l Ins. Co.*, 974 P.2d 1239, 1242 (Utah 1999). "However, policy terms are not necessarily ambiguous simply because one party seeks to endow them with a different interpretation according to his or her own interests." *Id.* Rather, "the proposed interpretation must be plausible and reasonable in light of the language used." *Id.* Courts construe ambiguous policy terms

liberally in favor of coverage in order to promote the purpose of insurance. *S.W. Energy*, 974 P.2d at 1242. "To protect against overreaching insurers and because courts construe contracts against their drafters, ambiguities in the policy are resolved in favor of coverage." *Quaker State Minit-Lube, Inc. v. Fireman's Fund Ins. Co.*, 868 F. Supp. 1278, 1292 (D. Utah 1994).

The insured bears the initial burden of showing that there is coverage for a particular claim under the policy. *See Utah Farm Bureau Ins. v. Dairyland Ins.*, 634 F.2d 1326, 1328 (10th Cir. 1980). The insurer then bears the burden of proving by a preponderance of the evidence that an exclusion to coverage applies. *LDS Hosp. v. Capitol Life Ins.*, 765 P.2d 857, 859-60 (Utah 1988). Courts construe provisions that limit or exclude coverage strictly against the insurer. *U.S. Fid. & Guar. Co. v. Sandt*, 854 P.2d 519, 522-23 (Utah 1993). "After an insurer meets its burden of proof that an exclusion applies, the burden then shifts to the insured to prove an exception to the exclusion applies." *Ironshore Specialty Ins. v. Callister, Nebeker & McCullough, P.C.*, No. 2:15CV677RJS, 2017 WL 6550678, at *5 (D. Utah Dec. 21, 2017) (unpublished); *Quaker State Minit-Lube, Inc. v. Fireman's Fund Ins.*, 868 F. Supp. 1278, 1312-13 (D. Utah 1994), *aff'd*, 52 F.3d 1522 (10th Cir. 1995). Therefore, in this case, Indian Harbor has the burden to demonstrate that the Options Exclusion applies, and Allegis has the burden to prove that the carve-back exception for fully covered put options applies.

## 1. Duty to Defend

Allegis first argues that it was a breach of contract for Indian Harbor to undertake the defense and then abandon it when Indian Harbor concluded that there was no coverage under the Policy. "An insurer's duty to defend a lawsuit against its insured is both separate and distinct from the insurer's duty to indemnify its insured for liability that is imposed against the insured after trial." *Aspen Specialty*, 954 F. Supp. 2d at 1315. "[A]n insurer may have a duty to defend

an insured even if . . . the insurer is ultimately not liable to indemnify the insured." *Id.* Under Utah law, an insurer must defend "when the insurer ascertains facts giving rise to potential liability under the insurance policy." *Basic Research LLC v. Admiral Ins. Co.*, 2013 UT 6, ¶ 7, 297 P.3d 578, 580.

Utah courts generally apply the "eight-corners rule" to determine potential liability for an insurer's duty to defend. *Equine Assisted Growth & Learning Ass'n v. Carolina Cas. Ins.*, 266 P.3d 733, 737 (Utah 2011). The eight-corners rule compares "the language of the insurance policy with the allegations of the complaint." *Benjamin v. Amica Mut. Ins. Co.*, 2006 UT 37, ¶ 16, 140 P.3d 1210. The duty to defend arises when "the allegations in the underlying complaint . . . if proved, could result in liability under the policy." *Nova Cas. Co. v. Able Constr., Inc.*, 983 P.2d 575, 578 (Utah 1999). Where "the allegations, if proved, show 'there is no potential liability [under the policy], there is no duty to defend." *Basic Research LLC v. Admiral Ins. Co.*, 297 P.3d 578, 580 (Utah 2013).

In this case, Indian Harbor has the burden to "demonstrate that none of the allegations of the underlying claims are potentially covered (or that a policy exclusion conclusively applies to exclude all potential for such coverage)." *Headwaters Resources, Inc. v. Illinois Union Ins.*, 770 F.3d 885, 891 (10th Cir. 2014). "The insurer has a duty to defend unless the insurer can establish that the allegations in the complaint are solely and entirely within the exclusions in the insurance policy." *Land v. Auto-Owners Ins. Co.*, 511 F. App'x 795, 800 (10th Cir. 2013). "To negate its duty to defend, an insurer must, therefore, do more than point to a potential lack of insurance coverage regarding one of the claims at issue (or a potentially applicable policy exclusion); instead, the insurer must demonstrate that none of the allegations of the underlying claim is potentially covered (or that a policy exclusion conclusively applies to exclude all potential for

such coverage)." *Id.*

In this case, Allegis argues that Indian Harbor improperly withdrew its defense when it had notice of seven different claims involving multiple parties and multiple claims. Investors alleged that Allegis had made misrepresentations, mismanaged their funds, breached fiduciary duties, engaged in securities fraud, been negligent, etc. Investors sought a return of all management fees and/or commissions paid in connection with the unsuitable investments. However, Indian Harbor asserts that all of the investors' complaints arise out of option trading, which is plainly excluded from coverage under the Policy.

The Policy's Options Exclusion bars coverage for "any Claim *or Defense Expenses* . . . [a]rising out of the actual or alleged purchase, sale, attempted sale, solicitation or servicing of any of the following: . . . Commodities, any type of future contracts, any type of option contract or derivative." There is no dispute that the August 2015 options trade sold and purchased options contracts, only whether they were fully covered or not.

None of the underlying claimants refer to other types of trading or investments, such as mutual funds or annuities. The claimants refer only to their options trading accounts and what occurred in those accounts. Some of the investors complain that their funds should have been placed in more conservative investments, but the complaints are that funds were used instead for options trading. In addition, some of the claimants complain about fees, but they are referring to higher fees charged for options trading.

The Policy exclusion Indian Harbor relies on applies to any claim arising out of options trading. Courts give an expansive meaning to the term "arising out of" in insurance policies. *Essex Ins. Co. v. Wake Up Too, Inc.*, No. 2:07CV312DAK, 209 WL 357987, at *7 (D. Utah Feb. 12, 2009) (unpublished). The term is "very broad, general and comprehensive," and means

"originating from, growing out of or flowing from." *Id.*

The court has reviewed the underlying claims Allegis presented to Indian Harbor. There are numerous, varied claims. For example, in one arbitration, multiple investors joined together in prosecuting various claims against Allegis because all of their claims flowed from the losses in the August 2015 options trade. But even the limited claims from outside that August 2015 time frame, relate to options trading. The exclusion applies irrespective of the legal theory of recovery as long as it is arises out of options trading. Whether the investors complain about unsuitability, misrepresentations, inadequate disclosures, professional negligence, breach of fiduciary duties, or excessive fees, the claims arise out of options trading. Some claims may involve more than one Policy provision, such as claims regarding fees. But Allegis could not have charged large fees for options trading if it did not trade options. Therefore, even if there are other provisions relating to fees, it does not prevent the exclusion for options trading from applying to the claim. Each of the underlying claimant's complaints arises out of, grows out of, or flows from "the actual or alleged purchase, sale, attempted sale, solicitation, or servicing of . . . option contract[s]." The language of the exclusion is plain, unambiguous, and broadly applies to all claims arising out of options trading. After reviewing each claim, the court finds no claim that falls outside of the Policy's Options Exclusion.

Allegis further argues that AIS, unlike AIA, did not actually oversee or direct any options trading. But the exclusion does not turn on whether the claims against AIS are meritorious or appropriate, only on whether the claims arise out of options trading, regardless of who directed the options trading. *Bethel v. Darwin Select Ins. Co.*, 735 F.3d 1035, 1042 (8th Cir. 2013) (finding that application of similarly-worded "Customer Funds Exclusion does not depend on *who* caused the loss or misuse of customer funds. Instead if focuses on *what* gave rise to the

claim." (emphasis in original)).  Therefore, under the language of the exclusion it is irrelevant whether the claims are asserted against AIS or AIA.

Allegis recognizes that no Utah appellate courts have ruled that an insurer must continue its defense until a court rules there is no coverage, but it request that the court adopt the law of other states which have so held.  Indian Harbor asserts that Allegis is effectively seeking to estop Indian Harbor from denying defense coverage.  Under Utah law, Allegis cannot use estoppel to extend the terms of the insurance contract.  *Youngblood v. Auto-Owners Ins.*, 111 P.3d 829, 835 (Utah 2005).  The Utah Supreme Court has stated that where "the insurer disclaims and withdraws prior to final judgment . . . . the insurer is not estopped . . . without proof by competent evidence that the insured was actually prejudiced by its conduct."  *State Farm Mut. Auto Ins. Co. v. Kay*, 487 P.2d 852, 855 (Utah 1971).  Allegis has not demonstrated any prejudice.  The timing of Indian Harbor's denial of coverage did not deprive Allegis "of an opportunity to prepare an adequate defense before trial or in the alternative to effect a settlement."  *Id.* at 856.  Utah law, therefore, does not require Indian Harbor to continue its defense until a court rules that there is no coverage if there is no proof of prejudice.

This is not a case where the application of certain policy provisions would require a determination of facts in the underlying proceeding.  Indian Harbor did not have a duty to defend until such facts were determined.  In this case, both the allegations in the underlying claims and the undisputed facts demonstrate that there is no coverage afforded for the options investor claims, discussed below.  This court finds no basis under Utah law to require Indian Harbor to continue defense coverage because it provided such coverage under a reservation of rights while it reviewed the claims, and the court declines to create new Utah law on the issue.

Accordingly, the court grants Indian Harbor's motion for summary judgment on the duty

to defend and denies Allegis' motion for summary judgment on the issue.

## 2. Duty to Indemnify

Allegis argues that the plain language of the Policy provides coverage for the options trading at issue. Whereas, Indian Harbor contends that the plain language of the Policy excludes coverage for the type of options trading Allegis engaged in August 2015. The Policy's exclusion bars coverage for "any Claim or Defense Expenses . . . [a]rising out of the actual or alleged purchase, sale, attempted sale, solicitation or servicing of any of the following: . . . Commodities, any type of future contracts, any type of option contract or derivative." There is no dispute that the August 2015 options trade sold and purchased option contracts. The parties agree that the Policy excludes coverage for options trading but contains a carve-back exception for fully covered put or call options. The dispute, therefore, is whether Allegis trading strategy in August 2015 was a fully covered put option.

Because that issue is an exception to a clear options trading exclusion, Allegis bears the burden of demonstrating that the exception applies. Courts in this district have recognized that placing the burden on the insured to prove an exception to an exclusion is the majority view. *Ironshore Specialty Ins. Co. v. Callister, Nebeker & McCullough*, No. 2:15cv677RJS, 2017 WL 6550678, *5 (D. Utah Dec. 21, 2017); *Quaker State Minit-Lube, Inc. v. Fireman's Fund Ins. Co.*, 868 F. Supp. 1278, 1312-13 (D. Utah 1994).

The Policy does not define "fully covered put or call option." Allegis argues that the put options in this case should be considered "fully covered" because there was sufficient cash on hand to cover the trade and the risk was finite and known when the trades were placed. However, Indian Harbor asserts that Allegis' traded put options and asserted definition of "fully covered" do not meet the standard regulatory and exchange definitions of "covered."

FINRA Rule 2360 (Options), is the only regulation specifically referenced in the underlying transaction documents. FINRA Rule 2360 defines the term covered in connection with writing/selling put options to require buying offsetting puts at the same or higher strike price of the puts sold. This definition is essentially identical to the definition provided in the Rules promulgated by the Cboe, which is the exchange where the puts were traded.[2] Notably, pursuant to the underlying transaction documents, Allegis and its advisors were bound by those rules, along with FINRA rules. Allegis' Chief Compliance Officer, Stacy Compagno, testified that Allegis was bound to follow these regulations. Therefore, even though the Policy does not define "fully covered" or "covered," the definition of "covered" in these regulations applied to Allegis' conduct and Allegis knew they did.

The August 2015 trade does not fall within these regulatory definitions of "covered." Heath Bowen, Allegis' President and 30(b)(6) witness, unequivocally admitted this in his deposition. The August 2015 trade was a "bull put spread," which is the inverse of "covered" because the exercise price of the puts bought (long position) was lower than the exercise price of the puts sold (short position). This exposed Allegis' clients to massive losses. Bowen also admitted that the risk disclosures provided to investors regarding "uncovered" options–a potential substantial loss if the sold put option is exercised and settled with cash–was the very risk confronted by the investors in the bull put/net credit spread and is the exact "substantial loss" they suffered as a result of the August 2015 trade.

Allegis cannot provide a reasonable alternative definition of "covered" that applies to the August 2015 trade. Allegis points to a definition of "cash secured" put provided on the Options Industry Counsel ("OIC") website. The Policy, however, makes no exception for "cash secured"

---

[2] The SEC and NASDAQ also approved similar definitions of covered.

puts. Equally problematic for Allegis, the August 2015 trade does not even qualify as "cash secured" because that definition would have required the investors to have $4 billion cash on hand to buy the stock underlying the puts they sold. Also, because Allegis was trading an index option, there was no underlying stock to invest in and purchase.

Allegis did a single-day trade solely for the purpose of collecting a one-time premium. Allegis did not have cash or treasury bills to buy the underlying instrument. The OIC specifically distinguishes a cash secured put writer from "a naked put writer whose only goal is to collect premium." Allegis was a naked put writer. Heath Bowen admitted that Allegis' August 2015 trade did not meet the OIC's definition of "cash secured." If Allegis had actually sold cash secured puts to purchase Russell 2000 stock, the investors would not only have recouped their losses as the market climbed back upward after the August 2015 correction, but they would have made sizeable gains. As it was, the Allegis' options investors suffered permanent losses from the August 2015 trade.

Other than the admittedly inapplicable OIC definition of cash-secured puts, Bowen could not point to a single source that supports Allegis' position that by simply having a "partially" offsetting long position and cash to cover the maximum loss the spread is considered covered. Not only is Allegis' proffered definition of a "covered" put option lacking in support, it is also patently unreasonable when viewed in the context of the Options Trading Exclusion as a whole. The exclusion, on its face, is written to preclude coverage for what are recognized as particularly high risk investments. The carve-back provision cannot reasonably be interpreted to permit coverage for a high-risk trade like the one that occurred in this case. The materials provided to the court demonstrate that covered puts or call options are well defined in the options industry. They do not result in the type of permanent losses Allegis' investors suffered in the present case.

The use of the term "fully covered" in the Policy merely emphasized that the traded puts had to be covered completely or in all respects, indicating that the Policy did not apply to a high-risk trade like Allegis' August 2015 trade, which caused significant permanent loss to Allegis' investors.

Based on the operative regulations, the court concludes that the August 2015 trade was clearly not a covered put option, let alone fully covered. Although the Policy does not define a "fully covered" put option, the Policy is not ambiguous because Allegis did not present a reasonable alternative definition of "fully covered." Accordingly, the court concludes that Allegis was not entitled to coverage under the Policy. The court, therefore, grants Indian Harbor's motion for summary judgment and denies Allegis' motion for summary judgment on indemnity under the Policy.

### 3. Aggregate Coverage Limit

Because the court has found that there is no coverage for the claims, Allegis' argument regarding the Policy's multiple claims provision is irrelevant. The Policy's Multiple Claims Provision states that "[t]wo or more Claims arising out of the same or related transaction or event, or arising out of the same or related act, error or omission, will be considered a single Claim and subject to the Per Claim Limit of Liability." Indian Harbor determined that the claims arose "out of the same or related transaction or event, or related act, error or omission" and applied a $1,000,000 claim limit. Therefore, even if this court were to reach the issue, the court would find, as it did above, that all of the investors' claims arise out of, originate from, grow out of, and flow from the August 2015 trade. *See Morden v. XL Specialty Ins.*, 2018 WL 4292227, at *1, 5 (10th Cir. Sept. 10, 2018). The underlying claimants are options investors with Allegis who lost money during the same period of time and who assert some variation of the complaint that

the high-risk strategy was not appropriate for them. Moreover, in disclosing the options investor claims to a subsequent insurer, Allegis declared that all of the claims were in regards to its net credit spread trade. Therefore, the Multiple Claim provision would have applied if the court had found that there was coverage under the Policy.

**4. Bad Faith Claim & Punitive Damages Claims**

Because the Policy does not cover the underlying investor claims against Allegis, Allegis' bad faith claim and request for punitive damages necessarily fail as well. Utah's standards for imposing liability on an insurer for a bad faith denial of coverage are clear. "If an insurer acts reasonably in denying a claim, then the insurer did not contravene the covenant [of good faith and fair dealing]." *Prince v. Bear River Mutual River Ins. Co.*, 56 P.3d 524, 533-34 (Utah 2002). "The denial of a claim is reasonable if the insured's claim is fairly debatable." *Id.*

Indian Harbor's denial of coverage based on the Options Trading Exclusion was not only reasonable, it was correct. Allegis' claim that the traded puts were purportedly covered because they were allegedly cash-secured is unreasonable. The absence of coverage precludes Allegis' bad faith denial of coverage claim as a matter of law. Moreover, even if Indian Harbor and the court are both wrong on that issue, the issue is at least fairly debatable and cannot be the basis of a bad faith claim.

Allegis' claim against Indian Harbor for failure to conduct a full and reasonable investigation is also not viable. Allegis claims that Indian Harbor did not conduct a full investigation but it does not point to facts that Indian Harbor should have discovered that would have provided a basis for coverage. Also, in response to Indian Harbor's denial letter, Allegis did not submit any additional information or try to contradict any facts regarding the trade despite Indian Harbor's invitation to submit any additional information. Allegis cannot now claim that

the issue was not fully investigated.

In addition, Allegis cannot plead a separate cause of action for punitive damages. This court repeatedly rules that punitive damages are a remedy, not a cause of action. Because Allegis' tort claim fails as a matter of law, so too does its request for punitive damages. *8665 North Cove LLC v. Am. Family Mutual Ins. Co.*, No. 2:12CV237DAK, 2014 WL 2777467, at *4 (D. Utah June 19, 2014). Accordingly, the court grants Indian Harbor's motion for summary judgment on Allegis' bad faith claim and request for punitive damages.

<u>**Gallagher and Nabavian's Motion for Summary Judgment**</u>

Gallagher and Nabavian (collectively, "Gallagher") move for summary judgment on all of Allegis' claims against them: (1) breach of contract; (2) breach of the implied covenant of good faith and fair dealing; (3) negligence; (4) breach of fiduciary duty; and (5) negligent misrepresentation.

**1. Breach of Contract**

Gallagher seeks summary judgment on Allegis' breach of contract claim, arguing that the only contractual obligation Gallagher had was to procure a Broker Dealer E&O insurance policy for Allegis and it is undisputed that Gallagher negotiated and procured such a policy for Allegis. Allegis, however, contends that Gallagher represented that it would gather and analyze data about Allegis' entities, offer tailored solutions, obtain a variety of coverage terms and conditions to protect Allegis' risks, and find appropriate coverage at a competitive price. Allegis claims that Gallagher breached that agreement by merely forwarding Allegis application to an insurance wholesaler, failing to gather and analyze additional data from Allegis, and failing to notify Allegis of the options exclusion.

First, Allegis asserts that Gallagher breached the agreement by merely forwarding

Allegis' application to an insurance wholesaler. Allegis does not identify a contractual provision preventing Gallagher from forwarding the application to an insurance wholesaler. The means Gallagher used to negotiated and procure an E&O Policy does not appear to be a contractual provision. Gallagher agreed to procure a policy and it procured one. The evidence shows that Gallagher provided Allegis with Proposals for Insurance in 2014 and 2015 which contained general information about the E&O coverage requested by Allegis and provided Allegis with a copy of the Policy. Gallagher performed any obligation it had to Allegis by negotiating and procuring the 2014 and 2015 E&O Policies through Indian Harbor. Gallagher's Proposal notified Allegis: "We will not be operating in a fiduciary capacity, but only as your broker/agent, obtaining a variety of coverage terms and conditions to protect the risks of your enterprise. We will seek to bind those coverages based upon your authorization; however, we can make no warranties in respect to policy limits or coverage considerations of the carrier. Actual coverage is determined by policy language, so read all policies carefully." Allegis accepted the terms and conditions of the Proposals by signing each year the Client Authorization to Bind coverage with Indian Harbor.

Allegis next asserts that Gallagher breached their contract by failing to gather and analyze additional data from Allegis. There is no affirmative representation where Gallagher promises to analyze data about Allegis or to procure appropriate or adequate insurance to cover all of Allegis' business risks. Nowhere in the 2014 or 2015 Proposals of Insurance does Gallagher agree to perform a comprehensive risk analysis of Allegis' coverage needs or its business risks. There was no basis for Allegis to assume that Gallagher could obtain insurance to cover every risk Allegis' business could face. Far from being a list of contractual obligations owed to Allegis, the language Allegis points to about gathering and analyzing data comes from a section reflecting

Gallagher's general effort to provide transparency regarding Gallagher's potential sources of income. The section does not list services that Gallagher is agreeing to perform. The purpose of the Compensation Disclosure section is highlighted by the use of permissive and hypothetical language such as "may" and "strives to." The disclosure states: "Gallagher strives to find appropriate coverage at a competitive price . . . to achieve these goals, we gather an analyze data about our customers . . . [which] helps us to better understand the marketplace . . . and offer tailored solutions to our customers." Allegis mischaracterizes the context of this language in an attempt to portray the terms as contractual obligations. The language does not form the basis for a breach of contract claim.

Furthermore, Allegis argues that Gallagher breached its contract by failing to notify Allegis of the options exclusion in the Policy. Gallagher's Proposal of Insurance expressed in clear and unambiguous language that it was not making any representations or warranties concerning actual terms, coverages, exclusions, or limitations of the E&O Policy and specifically instructed Allegis to read the policies carefully for details. Gallagher did not have an obligation to warn Allegis about every exclusion in the Policy. Gallagher expressly disclaimed a duty to warn Allegis regarding the specific details of the Policy. Gallagher expressly told Allegis: "Please carefully review these disclosures prior to signing the Client Authorization to Bind." Allegis accepted the terms and conditions of the Proposals by signing each year the Client Authorization to Bind coverage with Indian Harbor. These Authorizations clearly state that Allegis "understood this proposal provides only a summary of the details; the policies contain the actual coverages." The Proposals also explain that it is just an outline of the terms and conditions proposed by the insurer. The Proposal further stated that it "does not include all the terms, coverages, exclusions, limitations and/or conditions of the actual policy contract language.

The insurance policies themselves must be read for those details."

Allegis claims that the purported disclaimer of warranties in the 2015 Proposal is not determinative and does not insulate Gallagher from the breach. But, even considering the disclaimer in light of the entirety of the document, the court believes it would be clear to an average consumer that they needed to read the policy to understand the coverage that had been proposed. Allegis is a sophisticated business entity, not an average individual consumer. Allegis' business professionals tasked with procuring business insurance for Allegis should have read the policies they were tasked with obtaining for the company.

Contrary to Allegis' arguments, Gallagher did provide notice of the options exclusion by delivering both the 2014 and 2015 E&O Policies with explicit instructions to read the policies. While Pierce cannot recall whether he or anyone else at Allegis read the E&O Policy, the undisputed evidence shows that Allegis had notice of and copies of the 2014 and 2015 E&O policies with explicit instructions to read the policies. Allegis cannot fault Gallagher for its own failure to read and understand the terms of the policies before agreeing to bind itself to the proposed coverage.

Even assuming Allegis had read the policies carefully before authorizing Gallagher to bind coverage, the result would not have been different because Allegis' witnesses testified that they believe their Net Credit Spread strategy involved fully covered put options and was not excluded from coverage under the policies. And, after Indian Harbor refused to renew Allegis' E&O Policy, Allegis obtained another E&O policy from another insurer with a nearly identical options exclusion.

Allegis has not demonstrated any contractual obligation Gallagher had to Allegis other than to procure an E&O insurance policy. Gallagher procured a policy, proposed the policy to

Allegis, and Allegis authorized Gallagher to bind coverage. Allegis had ample time to review the E&O Policies and never rejected the insurance Gallagher proposed. Moreover, Allegis still claims that the policies actually provide it with coverage. Accordingly, the court finds that no triable issue of fact remains on Allegis' breach of contract claim and Gallagher is entitled to summary judgment on the claim.

## 2. Implied Covenant of Good Faith and Fair Dealing

Gallagher seeks summary judgment on Allegis' implied covenant claims, arguing that the claim fails as a matter of law because the covenant cannot establish new, independent rights or duties to which a party did not agree or create rights and duties inconsistent with express contractual terms. *Oakwood Village LLC v. Albertsons, Inc.*, 2004 UT 101, ¶ 45, 104 P.3d 1226. In *San Diego Assemblers, Inc. v. Work Comp for Less Ins. Servs. Inc.*, a broker bought an insurance policy for a contractor that contained a "prior completed work exclusion." 220 Cal App. 4th 1363, 2366 (2013). The contractor never requested a policy without this type of exclusion and sued the broker when coverage was denied based on the exclusion, claiming that an implied covenant obligated the broker to procure a policy without the exclusion. *Id.* The court disagreed and held that the contractor "does not assert and has not produced evidence Broker breached its limited duty to [procure the requested insurance.] Rather, [the contractor] seeks to hold Broker accountable for breaching a previously unrecognized implied contractual duty to investigate [its] coverage needs and procure the requisite coverage to meet those needs, even if [the contractor] did not request the coverage." *Id.* at 1369.

Similarly, Allegis has not identified any contractual provision that required Gallagher to procure an E&O policy without an options exclusion or that would specifically cover the net credit spread strategy.

Allegis argues that Utah courts acknowledge there is no general duty to procure adequate insurance, but also recognize that an additional duty to determine appropriate limits and customize a policy to cover the insured's business risks can arise in certain circumstances, including when the insured provides all the necessary information for the insurer to tailor a policy to the client's needs. *Asael Farr & Sons Co. v. Truck Ins. Exch.*, 193 P.3d 650, 660-61 (Utah Ct. App. 2008). However, in *Asael*, the court refused to "interpret *Harris* so broadly" as to impose a duty to procure a "policy that adequately covers all of the insured's risks." 193 P.3d at 660-61. And, in this case, Pierce, the employee obtaining insurance for Allegis, testified that he had no knowledge of the net credit spread strategy. He obviously did not provide Gallagher with information regarding the strategy or information specifically related to coverage for that strategy.

Allegis claims that Gallagher assumed the additional duty to procure adequate insurance because Gallagher held itself out as an expert in the insurance field and represented that Nabavian specialized in broker dealer policies. However, Allegis' CEO Heath Bowen testified that Allegis, not Gallagher, was in the best position "to understand whether the policy met [its] needs." No express or implied contractual terms obligated Gallagher to advise Allegis as to the adequacy of the coverage terms.

Allegis also argues that it disclosed in its application that it had $210 million under management in 2014 and projected $300 million in 2015 and that 25% of its business involved options trading. Allegis contends that this information was enough that Gallagher should have known that the options exclusion could create a gap in coverage that should be investigated, analyzed, and disclosed to Allegis. However, this argument ignores the fact that Allegis believed and continues to believe that the Indian Harbor Policy would cover claims arising from its net

credit spread strategy.

In *Allen v. Prudential Property & Cas. Ins.*, the Utah Supreme Court rejected the reasonable expectations doctrine and expressed its unwillingness to alter the terms of an insurance policy based on the expectations or intent of the insured. 839 P.2d 798, 805 (Utah 1992). Utah appellate courts have consistently rejected the reasonable expectations doctrine since *Allen*. Allegis cannot merely assert that it intended all of its business risks to be covered by the policy Gallagher proposed.

Allegis cannot rewrite the Proposals of Insurance to impose implied duties that go beyond the actual terms. Gallagher agreed to obtain insurance for Allegis to consider and to bind coverage if Allegis authorized it to do so. Gallagher did not agree to fully analyze all of Allegis' potential business risks and obtain coverage for all of them. There is no contractual provision obligating Gallagher to procure adequate coverage for Allegis. The implied covenant cannot establish new, independent rights or duties upon the parties. Accordingly, the court grants Gallagher's motion for summary judgment on Allegis' breach of the implied covenant of good faith and fair dealing claim.

### 3. Negligent Failure to Procure Claim

Allegis argues that Gallagher owed it a duty to procure adequate coverage because it provided Gallagher the necessary information. In order to prevail on its negligence claim, Allegis must prove that Gallagher (1) had a duty of care to protect Allegis against a certain risk, (2) Gallagher breached that duty, and (3) Galalgher's breach was the proximate cause of (4) Allegis' damages. *B.R. ex rel. Jeffs v. West*, 2012 UT 11, ¶ 5 n.2, 275 P.3d 228. Gallagher argues that it did not owe Allegis a duty to procure an E&O Policy that would cover all of Allegis' potential business risks, Allegis' net credit spread strategy, or obtain higher limits of

liability than Allegis requested. Gallagher contends it fulfilled any duty it owed to Allegis by procuring the E&O policy for Allegis to consider with the liability limits Allegis requested.

Allegis claims that Gallagher had a duty to procure adequate insurance for it without a specific request, relying on *Asael Farr & Sons Co. v. Truck Ins. Exch.*, 2008 UT App 315, §§30-32, 193 P.3d 650, 661. In *Asael*, the Utah Court of Appeals addressed the scope of an agent's duty to the insured and applied the "duty to procure" standard set forth by the Utah Supreme Court in *Harris v. Albrecht*, 2004 UT 13, ¶ 9, 86 P.3d 728. In *Harris*, the Utah Supreme Court recognized that "a duty to procure insurance may arise when an agent accepts an application; makes a bare acknowledgment of a contract covering specific kinds of casualty; lulls the other party into believing a contract has been effected through promises; and has taken care of the insured's needs without consultation in the past." *Id.* at ¶ 30.

Allegis claims that *Asael* recognizes a distinct duty to procure adequate coverage without a specific request. But in *Asael*, the court held that an agent did not owe a duty to procure more insurance than the plaintiff requested or to analyze the plaintiff's comprehensive insurance needs. 2008 UT App at ¶¶ 34-35. *Asael* explicitly rejected the argument that an agent has a duty not only to obtain insurance but to "secure a policy that adequately covers all of the insured's risks." 2008 UT App at ¶ 30. *Asael* actually supports Gallagher's position. To the extent that Allegis contends that *Asael* expands the scope of the general duty to procure insurance discussed in *Harris*, such argument is without merit.

It is undisputed in this case that Allegis obtained insurance in the amount it requested from Gallagher. In addition, Pierce did not give Gallagher information on the net credit spread strategy that would have created any duty to get coverage for that strategy. It is undisputed that Pierce did not know about the strategy at the time. Allegis never made a specific request that

Gallagher obtain coverage for claims that may arise out of Allegis' net credit spread strategy. Allegis also admitted that it was in the best position to "understand whether the policy met the needs of [the company]."

The court must consider the expectations of the parties as of the time of the agreement, not in hindsight. The parties communications prior to and after the agreement at issue demonstrate that Allegis' expectations were met. Prior to Indian Harbor's denial of coverage for the investors' claims, Allegis did not raise any concerns regarding the terms of its 2014 or 2015 E&O Policies. Allegis admits that even after a thorough review of the Policy, Allegis was sufficiently comfortable that its trading strategies were covered. In this litigation, Allegis continues to believe that the policies Gallagher obtained for it covers its net credit spread strategy. Therefore, there is no evidence supporting Allegis position that Gallagher failed to meet its duty to it.

Allegis argues that Gallagher owed a heightened duty to Allegis because of their "special relationship." In *Harris*, the Utah Supreme Court explained that "[w]here an insurance agent or broker promises, or gives some affirmative assurance . . . under circumstances which lulled the insured into the belief that such insurance has been effected, the law will impose upon the broker or agent the obligation to perform the duty which he has thus assumed." 86 P.3d at 732.

The undisputed facts establish that Allegis and Gallagher had nothing more than a standard broker/insured relationship. The Proposal of Insurance shows that Gallagher neither assumed additional responsibilities nor made any affirmative assurances that gave rise to a special relationship. Gallagher expressly disclaimed any warranties with respect to the terms, conditions, exclusions, and limitations of the policies. Gallagher did not have a heightened duty to warn Allegis as to coverage for a specific trading strategy.

Moreover, even if Gallagher had a duty to Allegis, Allegis has consistently taken the position that the Policy covers its net credit spread strategy. Accordingly, Allegis cannot demonstrate that Gallagher was the proximate cause of its failure to have coverage for that strategy.

Therefore, the court concludes that Allegis has not presented any evidence that Gallagher had a duty to procure insurance adequate to cover the net credit spread strategy, that it breached that duty, or that it was the proximate cause of Allegis' failure to have coverage for the strategy. Accordingly, the court grants Gallagher's motion for summary judgment on Allegis' negligence claim.

**4. Fiduciary Duty Claim**

Gallagher also seeks summary judgment on Allegis' fiduciary duty claim, arguing that Allegis cannot prove that Gallagher had a fiduciary duty to advise Allegis on the type and amount of coverage necessary to protect all of Allegis' potential risks. In this case, Gallagher's Proposal of Insurance specifically notified Allegis that it was not acting in a fiduciary capacity. Allegis, however, claims that the disclaimer in the Proposal of Insurance does not shield Gallagher from its fiduciary duty to Allegis.

Utah courts have reserved findings of fiduciary duties to relationships that evince a higher degree of trust than ordinary agency relationships. "In Utah, a fiduciary or confidential relationship will be found 'when one party, having gained the trust and confidence of another, exercises extraordinary influence over the other party.'" *State Bank of S. Utah v. Troy Hygro Sys. Inc.*, 894 P.2d 1270, 1275 (Utah Ct. App. 1995). "A fiduciary relationship imparts a position of peculiar confidence placed by one individual in another. A fiduciary is a person with a duty to act primarily for the benefit of another. A fiduciary is in a position to have and exercise and does

have and exercise influence over another. A fiduciary relationship implies a condition of superiority of one of the parties over the other. Generally, in a fiduciary relationship, the property, interest or authority of the other is placed in the charge of the fiduciary." *First. Sec. Bank of Utah N.A. v. Banberry Dev. Corp.*, 788 P.2d 1326, 1333 (Utah 1990).

In this case, Gallagher provided Allegis with an insurance policy to consider and it was for Allegis to determine whether it wanted to be bound to that policy. Allegis was in the superior position to know how the terms of the insurance contract would apply to its specific business practices and operations, and Allegis' CEO admitted as much. The parties were both business entities. While there is flowery language in the Proposal of Insurance about striving to assess and meet clients' needs, there is no clear promise to do so in any specific sense other than obtain a policy for the client to consider. And, importantly, the Proposal of Insurance contained clear language advising Allegis that Gallagher was not acting in a fiduciary capacity. The court finds no basis for Allegis' breach of fiduciary duty claim. The court, therefore, grants Gallagher's motion for summary judgment on Allegis' breach of fiduciary duty claim.

**5. Negligent Misrepresentation Claim**

Finally, Gallagher moves for summary judgment on Allegis' negligent misrepresentation claim, asserting that it fails as a matter of law because Allegis cannot identify any false statement Gallagher made to Allegis in its procurement of the 2015 E&O Policy. The elements of a claim for negligent misrepresentation are: "(1) a party carelessly or negligently makes a false representation expecting the other party to rely and act thereon, (2) the plaintiff actually relies on the statement, and (3) suffers a loss as a result of that reliance" *Moore v. Smith*, 158 P.3d 562, 574 (Utah Ct. App. 2007).

Allegis claims that Gallagher made false affirmative statements in its 2015 Proposal of

Insurance when it stated that its brokers gather and analyze data about the clients company, make a complete and personal presentation for each company, obtain a variety of coverage terms and conditions to protect the risks of the company, find appropriate coverage at competitive prices, and offer tailored solutions. But this attempt to cite a false statement simply identifies the same list of compensation disclosures offered in support of its breach of contract and fiduciary duty claims. The statements are a disclosure of how Gallagher may be compensated by insurers and are taken out of context. These statements are prospective and hypothetical in nature. They make no representations as to presently existing facts. Moreover, general language, such as a policy statement that Gallagher strives to cover its clients business risks, is not a false representation.

Under the undisputed facts of the case, Allegis cannot argue that Gallagher made a false statement as to the terms of the Policy. Gallagher's Proposal of Insurance clearly stated that it was an outline of the Policy's coverage and that Allegis needed to read the Policy for specific coverages and exclusions. This is not a case where Allegis summarized something in its Proposal of Insurance that was at odds with the terms of the Policy.

Allegis only takes issue with the fact that Gallagher did not include every Policy term of coverage and exclusion in the summary outline. However, the proposal is just that–a summary outline.

Allegis claims that Gallagher made a material omission in not disclosing the options exclusion or warning that certain options trading might not be covered. But Gallagher had no duty to expressly disclose every limitation or exclusion in the Policy. Gallagher notified Allegis that there were exclusions and limitations and expressly told Allegis to read the Policy provided

for details before authorizing Gallagher to bind coverage under the Policy.  That constitutes

adequate notice under the circumstances.  Allegis was a sophisticated business and could review

the Policy for its needs before authorizing Gallagher to bind coverage.

As a sophisticated business capable of reviewing the terms of the Policy, Allegis has not

shown that even if there were misrepresentations or material omissions in the Proposal of

Insurance, it reasonably relied on them.  In determining reasonable reliance, court consider the

"knowledge, education and experience of the person claiming reliance." *Guido v. Koopman*, 2

Cal. Rptr. 2d 437, 439 (Cal. Ct. App. 1991).  Allegis had the actual Policy, Gallagher told Allegis

to read the Policy for specific coverages and exclusions, and Allegis had the most information for

determining whether the Policy would cover its trading strategies.  As a matter of law, there was

no justifiable reliance. *Gold Standard, Inc. v. Getty Oil Co.*, 915 P.2d 1060, 1067 (Utah 1996).

Allegis cannot point to any false statement by Gallagher that it reasonably relied upon to

believe it would have coverage for its net credit spread strategy.  Moreover, even if Gallagher had

stated that the policy covered the strategy, Allegis continues to hold the position that such a

statement is true.  Accordingly, the court finds no basis for Allegis' negligent misrepresentation

claim and grants summary judgment in Gallagher's favor on the claim.

### Allegis' Expedited Motion to Add a Claim for Reformation or Amend Pleading

Allegis asks the court to reform the Policy to include coverage for options or,

alternatively, to amend the pleadings to conform to the proof set forth in the summary judgment

briefing.  The Utah Supreme Court has recognized that a contract may be reformed in two

instances. *Briggs v. Liddell*, 699 P.2d 770, 772 (Utah 1985).  "First if the instrument does not

embody the intentions of both parties to the contract. A mutual mistake has occurred and

reformation is appropriate." *Id.*  A contract may also be reformed "if one party is laboring under

a mistake about a contract term and that mistake either has been induced by the other party or is known by and conceded to by the other party, then the inequitable nature of the other party's conduct will have the same operable effect as a mistake." *Id.* "[T]he party seeking reformation must establish the mistake by clear and convincing proof." *Id.*

While Allegis' initial brief generally sought coverage for options under the Policy, its reply brief more specifically asks for the Policy to be reformed to have the existing exception to the options exclusion apply to Allegis' net credit spread strategy. Therefore, the reformation would leave the options exclusion in place but reform the exception for fully covered put options to include the high-risk naked puts Allegis employed in August 2015.

Allegis argues that there was both mutual and unilateral mistake. Allegis claims that it and Gallagher both thought that the Policy covered options and that Indian Harbor must have thought options were covered because the underwriter charged an additional premium for options. Allegis claims that the underwriting rating worksheet the underwriter employed was priced for naked options. While the underwriter equivocated and could not remember if the pricing sheet was based on naked options, Allegis claims the price it ultimately paid was consistent with coverage for naked options. Therefore, Allegis contends that the confusion on whether the exception to the option exclusion applies in this case should be resolved by reforming the contract to reflect the intent of the parties to cover Allegis' net credit spread strategy.

Although Allegis claims that the parties' intent was for the Policy to cover Allegis' net credit spread strategy, Pierce, who was tasked with obtaining the Policy, was unaware of the strategy until the losses occurred in August 2015. He did not explain the strategy or provide Gallagher or Indian Harbor with information about the strategy. Neither Pierce nor the CEO read

the Policy when it was proposed to determine what the Policy contained or covered. Neither Allegis' 2015 application nor its Form ADV Part 2A make any reference to its net credit spread strategy, or any options trading strategy. There is no evidence that Gallagher knew about the net credit spread strategy. Allegis' only evidence is a vague claim that it believes it was charged a higher premium for options even though the underwriter witness could not corroborate it. While Allegis claims that all the parties intended the exception to the options exclusion to apply to the net credit spread strategy, there is no evidence that anyone involved in the procurement of the Policy even knew about the strategy at the time.

Moreover, the reading of the exception Allegis seeks in its reformation would completely swallow the options exclusion. The exclusion lists several risky trading vehicles that are excluded from coverage but provides a carve-back for the safer trading of fully covered put options. Reforming the Policy to allow for an exception for high-risk naked put options is contrary to the intent of the provision.

To reform the Policy, Allegis must show mistake by clear and convincing evidence. But, in fact, the court concludes there is little to no evidence demonstrating that the failure of the Policy to cover Allegis' net credit spread strategy was a mutual mistake.

Allegis also argues that there is evidence of a unilateral mistake. Under a unilateral mistake, reformation is appropriate when one party's mistake "is coupled with knowledge of the mistake by the other party or a mistake is produced by fraud or other inequitable conduct by the non-erring party." *Guardian State Bank v. Stangl*, 778 P.2d 1, 5 (Utah 1989). Allegis' 2015 application noted that a portion of Allegis' business involved options. However, such a notification in an application did not automatically ensure coverage for all types of options trading.

There is no evidence that Indian Harbor fraudulently induced Allegis into mistakenly believing that all option trading strategies would be covered. Indian Harbor provided a Policy to Gallagher, and Gallagher presented the Policy to Allegis, specifically telling Allegis to read the Policy to review specific coverages and exclusions. Allegis failed to read the Policy and failed to learn what was covered and what was excluded prior to giving Gallagher authorization to bind coverage. The language of the Policy is clear that some types of options trading is covered and some is not. As a sophisticated business entity engaged in options trading and capable of assessing its own needs, there was no undue influence or inducement to enter the Policy as it was presented. Allegis could have read the Policy, discussed the issue regarding different coverages for different types of options trading, and been fully informed prior to authorizing Gallagher to bind coverage. Given that none of the individuals involved in the negotiation and procurement of the Policy knew about the net credit spread strategy, there is no evidence that Indian Harbor lulled Allegis into thinking that the strategy was covered. The court concludes that there is no evidence to support a finding of unilateral mistake.

Accordingly, the court finds no basis for reforming the Policy to include coverage for Allegis' net credit spread trading strategy.

## CONCLUSION

Based on the above reasoning, Plaintiffs Allegis Investment Services, LLC, and Allegis Investment Advisors, LLC's Motion for Summary Judgment [Docket No. 122] is DENIED; Defendant Indian Harbor Insurance Company's Motion for Summary Judgment [Docket No. 125] is GRANTED; Defendants Arthur J. Gallagher & Co. and Paige Nabavian's Motion for Summary Judgment [Docket No. 126] is GRANTED; and Plaintiffs' Expedited Motion to Add a Claim for Reformation Under Plaintiffs' Declaratory Judgment Action or, Alternatively, to

Amend Pleading to Conform to Proof [Docket No. 215] is DENIED. Because this decision

disposes of all the issues in the case, the court finds the pending motions in limine [Docket Nos.

119, 120, 121, 128] MOOT.

DATED this 1st day of March, 2019.

BY THE COURT:

DALE A. KIMBALL,
United States District Judge